UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **STEWART BROTHERS INDEPENDENT CONTRACTORS, L.L.C.,**<br>    **Plaintiff** | **CIVIL ACTION** |
| **VERSUS** | **No. 11-579** |
| **RENATA LAKES APARTMENTS, L.P.,**<br>    **Defendant** | **SECTION "E"** |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter was tried before the Court, sitting without a jury, from March 25, 2013 to March 27, 2013.[1] After trial, the Court ordered the parties to submit post-trial briefs, all of which have been submitted.[2] Having considered the testimony and evidence at trial, the pre- and post-trial briefs submitted by the parties, the arguments of counsel, and the applicable law, the Court now issues the following Findings of Fact and Conclusions of Law in accordance with Federal Rule of Civil Procedure 52(a). To the extent that any findings of fact may be construed as conclusions of law, the Court hereby adopts them as such. To the extent that any conclusions of law constitute findings of fact, the Court adopts them as such.

### FINDINGS OF FACT

#### I.    The Parties

1.   Plaintiff Stewart Brothers Independent Contractors, L.L.C. ("SBIC") is a limited liability company organized under the laws of the State of Louisiana and having its

---

[1] R. Doc. 62 (Minute entry from first day of bench trial); R. Doc. 63 (Minute entry from second day of bench trial); R. Doc. 64 (Minute entry from third and final day of bench trial).

[2] *See* R. Doc. 65 (SBIC's post-trial memorandum); R. Doc. 66 (RLA's post-trial memorandum); R. Doc. 68 (SBIC's response to RLA's post-trial memorandum); R. Doc. 69 (RLA's response to SBIC's post-trial memorandum).

1

principal place of business in the State of Louisiana.[3]  SBIC is comprised of two members, Kevin T. Stewart ("Kevin Stewart") and Christopher E. Stewart ("Chris Stewart"), both of whom are citizens and residents of the State of Louisiana.[4]

2. Defendant Renata Lakes Apartments, L.P. ("RLA") is a limited partnership organized under the laws of the State of Delaware and having its principal place of business in the State of New York.[5]  RLA has one general partner, Renata Lakes Management, LLC, and three limited partners, Robert Siegel ("Mr. Siegel"), Roberta Robel Becker ("Mrs. Becker") and Brian N. Becker ("Mr. Becker").[6]  Renata Lakes Management, LLC is a limited liability company organized under the laws of the State of Delaware and having its principal place of business in the State of New York.[7]  Renata Lakes Management, LLC is comprised of two members, Mr. and Mrs. Becker.[8]  Mr. Siegel, Mrs. Becker, and Mr. Becker are all citizens and residents of the State of New York.[9]

## II. The Contract

3. On February 10, 2010, an agreement captioned "Contract Between Owner and Contractor" (the "Contract") was executed by RLA and Stewart Brothers Construction,

---

[3] R. Doc. 1-2 (SBIC's petition for damages); R. Doc. 1 (Notice of removal); R. Doc. 38 (Amended notice of removal).

[4] R. Doc. 38.

[5] R. Doc. 1; R. Doc. 38.

[6] R. Doc. 38.

[7] *Id.*

[8] *Id.*

[9] *Id.*

Inc.[10]  On page one of the Contract, the Owner is listed as Renata Lakes Apartments, LP and the Contractor is listed as "Stewart Brothers."[11]  On the first page of Trial Exhibit 2, identified as Exhibit A to the Contract, under the heading "Scope of work," RLA is listed as the "Customer," Bernard Construction is listed as the "Contractor," and SBIC is listed as the "principal Sub-contractor."[12]  On the third page of Trial Exhibit 2, also identified as Exhibit A, there is a statement at the top of the page that "The following are the services to be provided to Owner from Contractor" and the name Bernard Construction with the words "Scope of Work" appears.[13]

4.  The first page of Trial Exhibit 2, captioned "Exhibit A - Scope of Work," provides the following description of the project:

> This is a turnkey project involving the gut renovation, upgrade and modernization of 83 units in 11 buildings at Renata Lakes Apartments, 100 Chateau Court, Houma Louisiana.  The Contractor shall deliver all apartment [sic] complete and in ready to rent condition, and should examine the 32 completed and rented units that were completed in 2008.[14]

5.  The third page of Trial Exhibit 2, captioned "Exhibit A. I. Bernard Construction: Scope of Work" describes on pages 3 and 4 the work to be done by Bernard Construction.  The last paragraph of page 4 of Trial Exhibit 2 provides that "Except the jobs specifically designated above as the responsibility of Bernard Construction, the balance of the work

---

[10] The plaintiff in this action is Stewart Brothers Independent Contractors, LLC and the entity that signed the Contract was Stewart Brothers Construction, Inc.  The defendant has not questioned the plaintiff's right to sue on the Contract.

[11] Trial Exhibit 1 at p. 1.

[12] Trial Exhibit 2 at p. 1.

[13] Trial Exhibit 2 at p. 3.

[14] Trial Exhibit 2 at p. 1.

is the responsibility of Stewart Brothers Construction. This is a turnkey project and all 83 units are to be delivered ready to rent, without defect, complete and the work shall include but not be limited to:". Even though this sentence ends with a colon, no description of work follows. No signatures appear on this portion of Exhibit A.[15]

6. Pages 5 - 9 of Trial Exhibit 2, captioned "Exhibit A.II. Scope of Work – Stewart Brothers" describes the work to be done by SBIC. The description of the work is very general and no plans or specifications are provided.[16] On page 9, Kevin Stewart signed as President of Stewart Brothers Construction, Inc. and Mrs. Becker signed as Manager of Renata Lakes Management, LLC.[17]

7. Trial Exhibit 3, captioned "Exhibit B, General Specifications," describes the project as follows:

> This is a gut rehabilitation of 83 units in an existing 115 unit apartment complex. Formal specifications have not been prepared. Contractor is expected to examine the recently renovated units and perform work in a similar fashion thereto, and to deliver the apartment units ready to rent and in Turnkey fashion without leaving any remaining work to the owner.[18]

8. Article 2.2 of the Contract calls for the project to be completed within 220 calendar days of the project's "commencement date" of February 20, 2010, excluding delays caused by inclement weather and "reasons caused by the other contractor's delay."[19] Under Article 2.2, failure to achieve substantial completion of the project after

---

[15] Trial Exhibit 2 at p. 4.

[16] Trial Exhibit 2 at pp. 5-9.

[17] Trial Exhibit 2 at p. 5.

[18] Trial Exhibit 3.

[19] Trial Exhibit 2 at p. 2.

September 28, 2010, excluding weather delays and "other contractor" delays, would result in liquidated damages of $200 per day beyond that deadline until the project was substantially complete.[20]

9. Exhibit C to the contract, captioned "Payment Schedule," lists general tasks to be completed in each building or group of buildings.[21]

10. Exhibit E of the contract, captioned "Materials Agreement," provides that RLA will provide all of the materials for the project, unless otherwise specified.[22]

11. RLA agreed to pay SBIC $8,500 per apartment unit.[23]

12. RLA paid a $3,000 mobilization fee to SBIC up front and later paid an additional $50,000 mobilization fee.[24] The $53,000 was to be applied over time to payment for the work on the Project.[25]

13. The Contract called for RLA to make progress payments "based upon Applications for Payment to the Owner by the Contractor and Certificates for Payment issued by the Owner as provided below and elsewhere in the Contract Documents."[26] The Contract further provides:

---

[20] *Id.*

[21] Trial Exhibit 4.

[22] Trial Exhibit 5 at p. 1-2 and trial testimony of Mrs. Becker.

[23] Kevin Stewart, Mr. Becker and Mrs. Becker all testified to this amount.

[24] Mrs. Becker testified that she understood the payment schedule to require the $53,000 mobilization fee to be "repaid" in the form of a $7,143 reduction in the amount owed by RLA for Phase Three in each building or group of buildings. While Mrs. Becker called this a "repayment" of the mobilization fee, it really was just an up front lump sum payment to jump start the project.

[25] Trial testimony of Mrs. Becker.

[26] Trial Exhibit 1 at p. 3.

> The period covered by each Application for Payment shall be one calendar month ending on the last day of the month or as follows: First payment equal to 90% of the Contract Sum, paid to the Contractor upon 100% completion of the contract and approval per the Owner's inspection. 10% retainage – SEE RESPECTIVE ATTACHED PAYMENT SCHEDULES – to be paid within 30 days of completion and final approval per and inspection by the Owner.[27]

14. The payment schedule defines the order in which SBIC was to perform the work and, as explained above, defines the specific tasks to be completed in each building or group of buildings.[28]

15. According to the payment schedule, SBIC was to work on building L first, then buildings E and F, then buildings I and J, then building K, then building M, then building C, and then buildings A and B.[29]

16. RLA and SBIC later agreed, however, that SBIC would work on all of the buildings at the same time to maximize efficiency of work to be done by subcontractors.[30]

17. The payment schedule also further defines the progress payments called for in the contract.[31] The schedule divides each building or group of buildings into three Phases, each of which represents roughly one-third of the work to be done on a particular building or group of buildings, and provides that for each building or group of buildings, RLA was to pay 25% of the total owed for that building or group of buildings

---

[27] *Id.*

[28] Trial Exhibit 4.

[29] *Id.*

[30] Trial testimony of Kevin Stewart and Mrs. Becker.

[31] Articles 4, 5, and 15 of the contract also relate to RLA's payment obligations and refer to the attached payment schedule.

6

after completion of Phase One, another 25% after completion of Phase Two, and another 40% after completion of Phase Three.

18. The final payment of the Contract Sum was to be paid within 30 days after the Work had been completed.[32]

### III. Work Performed by SBIC and Payments Made by RLA

19. Soon after the contract was signed, SBIC began work on the project.[33] RLA failed to provide plans and specifications for the Project and failed to require change orders to clearly document revisions to the Contract. Both RLA and SBIC failed to document work done or payments made. Because the records kept by both plaintiff and defendant are incomplete and inconclusive, the Court relied on trial testimony in determining the tasks SBIC performed on the project and the payments made by RLA.

20. The parties agree RLA paid $307,990.57 to SBIC for work performed on the project,[34] including the $53,000 mobilization fee. While not always clear, most of the payments made by RLA correspond to specific tasks performed by SBIC, thus allowing the Court to determine which work was performed but not paid for.

21. The evidence at trial demonstrated that SBIC performed the following tasks under the Contract for which RLA has not remitted payment:

 • $6,500 worth of work "removing furniture, dishes, clothing etc. from apartments before demolition";[35]

---

[32] Trial Exhibit 1, p. 3.

[33] Trial testimony of Kevin Stewart.

[34] Trial Exhibit 105.

[35] Both Kevin Stewart and Mrs. Becker testified that this work was done. Kevin Stewart testified that RLA never paid him for this work. Mrs. Becker testified that this work was to be included under the Contract, while Kevin Stewart testified that it was not. None of the checks submitted by RLA clearly shows

- $7,000 worth of work "secur[ing] apartment buildings with plywood and 2x4s";[36]

- $7,500 worth of work "moving materials from buildings L to M and to I and K";[37]

- $3,500 worth of "grass and lawn care work";[38]

- $1,000 worth of "tree removal, "stump grinding," and "tilling and grading" work;[39]

- $4,000 worth of "Laundry Machine and Tree Removal" work in Building H;[40]

---

payment for this work. RLA did not dispute the invoiced price, which the Court finds reasonable.

[36] Both Kevin Stewart and Mr. Becker testified that this work was done and that it was not paid for. While RLA quarrels with the invoiced price in its post-trial memorandum, *see* R. Doc. 66-1, the Court finds SBIC met its burden of establishing it performed the work and that the amount it invoiced was reasonable.

[37] Kevin Stewart, Mrs. Becker, and Shane Bernard all testified this work was done and that it was not paid for. While RLA quarrels with the invoiced price in its post-trial memorandum, *see* R. Doc. 66-1, the Court finds SBIC met its burden of establishing it performed the work and that the amount it invoiced was reasonable.

[38] Kevin Stewart and Mrs. Becker both testified this work was done. Kevin Stewart testified that RLA never paid him for this work, which Mrs. Becker conceded. Mrs. Becker testified that this work was under the Contract, while Kevin Stewart testified that it was not. None of the checks submitted by RLA clearly shows payment for this work. RLA also disputes the invoiced amount, arguing it is too high. However, Mrs. Becker testified that lawn care ordinarily costs the complex $800 a month. SBIC was on the Project for approximately five months, from February 2010 to August 2010. The invoiced price of $3,500 is reasonable.

[39] Kevin Stewart and Mrs. Becker both testified these tasks were performed. Kevin Stewart testified that RLA never paid him for this work, which Mrs. Becker conceded. None of the checks submitted by RLA clearly shows payment for this work. RLA disputes the invoiced amount, arguing it is too high. Shane Bernard testified that these tasks could have been performed for approximately $1,000, which the Court finds reasonable. Accordingly, the Court finds RLA owes $1,000 to SBIC for performing these tasks.

[40] Kevin Stewart and Mrs. Becker both testified this work was done. Kevin Stewart testified that RLA never paid him for this work, which Mrs. Becker conceded. None of the checks submitted by RLA clearly shows payment for this work. RLA does not seriously dispute the $4,000 invoiced price, which the Court finds reasonable.

- $1,800 worth of "Laundry room framing and flooring" work in Building H;[41]

- $3,700 worth of work "framing in E and F Inside and Out";[42] and

- $7,200 worth of work installing tubs in Buildings E and F.[43]

22. In total, SBIC performed $37,900 worth of work under the Contract for which RLA has not remitted payment.

23. The evidence at trial demonstrated that SBIC performed the following taks that were not included in its scope of work under the Contract and for which RLA has not remitted payment:[44]

---

[41] "Laundry room floor and walls" is included in Phase One of Buildings E&F. At trial, RLA stipulated that SBIC performed 100% of Phase One in Buildings E&F. None of the checks submitted by RLA clearly shows payment for this work. Moreover, RLA does not seriously dispute the $1,800 invoiced price, which the Court finds reasonable.

[42] RLA argues this task is included in Phase One of Buildings E&F, which RLA stipulated was fully completed by SBIC. While it is not clear which of the enumerated tasks in Phase One RLA claims to include indoor and outdoor framing, RLA concedes SBIC did, in fact, perform indoor and outdoor framing work in Buildings E&F. None of the checks submitted by RLA clearly shows payment for this work. RLA does not seriously dispute the $3,700 invoiced price for this task, which the Court finds reasonable.

[43] "Plumbing rough in" is included in Phase One of Buildings E&F. While Kevin Stewart argued that tub installation was done off the Contract, the Court finds it is "plumbing rough in" work and thus falls under the Contract. At trial, RLA stipulated that SBIC performed 100% of Phase One in Buildings E&F. Kevin Stewart also testified this work was done. None of RLA's checks shows payments for this work. Moreover, RLA does not seriously dispute the $7,200 invoiced price, which the Court finds reasonable.

[44] *See* Trial Exhibit 38 (SBIC's "Invoice #0031," dated August 2, 2010) ("Invoice 31"). SBIC presented Invoice 31 at trial as a comprehensive list of tasks performed outside the Contract and for which payment was not received. Kevin Stewart testified at trial, however, that the following tasks, while listed on Invoice 31, were not actually performed by SBIC: (1) $1,700 worth of "maintenance building repairs" and (2) $2,000 worth of work "clean[ing] up [and] cutting down trees around the [property management] office." The $3,000 listed at the bottom of Invoice 31 does not correspond to any specific task. Kevin Stewart testified that his company performed all the other tasks listed in Invoice 31 and that SBIC did not receive payment from RLA for any of them. It became clear at trial, however, that several of the items listed on Invoice 31 have actually already been paid by RLA. These items are (1) $2,500 in "maintenance work," (2) $1,700 worth of "installing . . . Ground Fault Interceptors"; and (3) $3,200 worth of "laundry room electrical and plumbing." As with the tasks that were not performed, SBIC does not claim it is owed for tasks for which it has already been paid. Finally, the Court notes that a few of the tasks listed in Invoice 31, while undisputedly performed by SBIC, were invoiced at an unreasonably high rate. The Court addresses these tasks as necessary.

- $5,232.44 worth of maintenance work;[45]

- $6,735 worth of work "constructing a New fence adjacent to L apartments";[46]

- $2,000 worth of "HVAC heater installation" work;[47]

- $3,500 worth of work "cutting and reframing" the doors in Building L, which were installed before the carpet was installed in that building; $5,100 worth of work repainting the walls in Building L after ceramic tiles were installed; and $2,700 worth of work reinstalling toilets in Building L;[48]

- $2,900 worth of work installing dryer vents in Building L;[49]

- $8,200 worth of work "staining cabinets in Building L";[50]

- $6,000 worth of work "staining stairwells in Building L";[51]

---

[45] *See* Trial Exhibits 20, 23, and 25. SBIC submitted an invoice for $3,797.44 twice, purportedly for different instances of off-contract "maintenance work." *See* Trial Exhibits 23 and 25. RLA admits $3,797.44 in maintenance work was performed, but Mrs. Becker did not know why there were two invoices listing this amount. When questioned about this double submission at trial, Kevin Stewart was unable to credibly explain his entitlement to payment under both invoices. The Court also credits SBIC for the off-Contract maintenance work invoiced in Trial Exhibit 20 for which RLA has not remitted payment.

[46] Both Kevin Stewart and Mrs. Becker agreed this work was done and that it was not done pursuant to the Contract. Kevin Stewart invoiced this task at $12,700, *see* Trial Exhibit 38, which he based on the new fence being 600 linear feet and a "per linear foot" rate of $17. Mrs. Becker and Shane Bernard both testified that the new fence was actually only 375 linear feet based on a survey of the property. Using the $17 per linear foot rate, the value of the new fence work was $6,375.

[47] Both Kevin Stewart and Mrs. Becker testified this work was done off the Contract. RLA does not seriously dispute the $2,000 invoiced price, which the Court finds reasonable.

[48] Both Kevin Stewart and Mrs. Becker testified these tasks were performed off the Contract. Shane Bernard testified that he thought these tasks were unnecessary and/or caused by SBIC's incompetence. RLA does not seriously dispute the invoiced prices for these three tasks, all of which the Court finds reasonable.

[49] Both Kevin Stewart and Mrs. Becker testified this task was performed off the Contract. Similar to SBIC's work cutting and reframing the doors, repainting the walls, and reinstalling the toilets in Building L, Shane Bernard testified at trial that this task was unnecessary. RLA does not seriously dispute the $2,900 invoiced price for this task, which the Court finds reasonable.

[50] Both Kevin Stewart and Mrs. Becker testified that this task was performed off the Contract. RLA argues SBIC needed only to apply one coat of stain, and thus that the invoiced price of $8,200 is too high. Kevin Stewart explained that two coats were needed, and the Court finds this to be reasonable.

[51] Both Kevin Stewart and Mrs. Becker testified this work was done. Kevin Stewart testified that it was done off the Contract, while Mrs. Becker testified that it was done under the Contract. The Court agrees with SBIC that this work does not fall into any one of the enumerated tasks listed in SBIC's scope of

- $1,200 worth of work on the refrigerator doors in Building L;[52] and

- $1,800 worth of "demo, clean up and framing" work in Building K after a car crashed into that building.[53]

24. SBIC also used $3,000 worth of generator gas on the project site.[54] Because SBIC was not contractually obligated to provide its own generators,[55] this $3,000 amount represents another off-contract expense for which RLA is responsible.

25. Including generator gas costs, SBIC performed a total of $48,367.44 worth of off-contract work for which RLA has not remitted payment.

26. Including on- and off-contract work, SBIC performed a total of $86,267.44 worth of work at the Renata Lakes Apartment complex for which RLA has not remitted payment.

### IV. Termination of the Contract by RLA

27. On August 3, 2010, 168 days after the Project's commencement date, RLA terminated the Contract and ordered SBIC off the Property.[56]

28. Under the Contract, SBIC had 220 days from the commencement date to complete all

---

work in the Contract. Accordingly, this work was done off the Contract. RLA does not dispute the $6,000 invoiced price, which the Court finds reasonable.

[52] Both Kevin Stewart and Mrs. Becker testified this task was performed off the Contract. Shane Bernard testified at trial that this task was unnecessary, but Kevin Stewart testified that it was necessary. RLA does not seriously dispute the $1,200 invoiced price for this task, which the Court finds reasonable.

[53] Kevin Stewart, Mrs. Becker, and Mr. Becker all testified this work was done off the Contract. RLA quibbles with the invoiced cost, arguing it is too high, but the Court finds it is reasonable and supported by the evidence at trial.

[54] *See* Trial Exhibit 38; trial testimony of Kevin Stewart.

[55] RLA was in charge of materials. SBIC was to provide labor only.

[56] Trial Exhibit 64.

phases of all buildings.[57]

29. RLA listed a number of reasons why it believed it had sufficient cause to terminate the contract, including SBIC's failure to timely complete Phase One of the contract and deliver in "turnkey condition and ready to rent" sixteen town homes in Building L within 168 days (out of 220 total days to complete the project); SBIC's failure to complete work in the other buildings as called for in the other Phases of the contract within 168 days; SBIC's "failure to properly install air conditioners"; SBIC's "failure to remedy"; SBIC's "failure to adequately staff job"; and SBIC's "other unstated violations of the contract terms." The August 3, 2010 termination notice also included a narrative written by Mr. Becker detailing these alleged breaches.[58]

30. SBIC admits the Project was not complete on the day the contract was terminated, but Kevin Stewart testified the Contract was terminated approximately sixty days early.[59] He testified SBIC would have been able to complete the Project in a timely fashion had SBIC not been terminated.[60]

## CONCLUSIONS OF LAW

### I. Jurisdiction and Venue

1. The Court has subject matter jurisdiction over this matter, pursuant to 28 U.S.C. § 1332. The parties are completely diverse and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

---

[57] Trial Exhibit 1 at p. 2.

[58] Trial Exhibit 64.

[59] Trial testimony of Kevin Stewart.

[60] *Id.*

2.   Venue is proper in this district, pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to SBIC's claim occurred in the Eastern District of Louisiana and the property that is the subject of this action is situated in this district.

## II.   Choice of Law

3.   Because the Court is sitting in diversity, the Court applies the substantive law of Louisiana, the forum state. *See, e.g., Holt v. State Farm Fire & Cas. Co.*, 627 F.3d 188, 191 (5th Cir. 2010) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)). The Contract specifically provides that Louisiana law governs disputes arising thereunder.[61]

## III.   SBIC and RLA Had a Valid Contract Under Louisiana Law

4.   Under Louisiana law, the elements of a valid contract are defined as follows:

> A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished. La. C.C. art. 1906. The four elements of a valid contract are: (1) the parties must possess the capacity to contract; (2) the parties' mutual consent must be freely given; (3) there must be a certain object for the contract; and (4) the contract must have a lawful purpose. *Provenza v. Central & Southwest Services, Inc.* 34,162 (La. App. 2 Cir. 12/15/00), 775 So.2d 84, 85. These basic requirements for the formation of a contract are found in Title IV of the civil code. Specifically, article 1918 provides for capacity; article 1927 provides for consent; article 1966 provides that an obligation cannot exist without a lawful cause; and article 1971 provides that parties may contract for any object that is lawful, possible and determined or determinable. The first step in contract law is to determine whether a contract was formed by offer and acceptance. *State v. Givens*, 99–3518 (La. 1/17/01), 776 So.2d 443, 455. The party demanding performance of a contract has the burden of proving its existence. *Id.*

*La Bo J Partnership v. La. Lottery Corp.*, 08-1279 (La. App. 1 Cir. 1/30/09); 6 So.3d

---

[61] *See* Trial Exhibit 1 at p. 14.

191, 194, *writ denied*, 09-441 (La. 4/13/09); 5 So.3d 168; *see also Granger v. Christus Health Cent. La.*, 12-1892 (La. 6/28/13); — So. 3d —, 2013 WL 327128, at *17 (internal citations omitted) ("Under Louisiana law, the requirements for a valid contract are capacity, consent, a lawful cause, and a valid object.")

5. In this case, all four elements for a valid contract under Louisiana law are satisfied. First, both RLA and SBIC possessed capacity to contract. Second, both RLA and SBIC mutually and freely consented to the formation of the contract. Third and fourth, the object of the contract is determinable - the "gut rehabilitation" of units at the Renata Lakes Apartments complex. As a result, the Court finds that RLA and SBIC had a valid, enforceable contract under Louisiana law.

6. SBIC's obligations under the Contract were limited to the specific items listed in its scope of work and the attached payment schedule. Despite certain vague references in the Contract to the project being a "turnkey" project, there is no evidence that the parties ever reached an agreement that the project would, in fact, be a turnkey project in which SBIC was responsible for doing anything and everything necessary to complete the Project. Instead, both the Contract itself and the parties' conduct in carrying out the Contract - for example, RLA's divvying up work between SBIC and Bernard Construction and the Contract's confusing and contradictory explanations of the two contractors' scope of work - was such that there is no way SBIC could have ever understood the project to be its sole obligation to deliver "turnkey." Kevin Stewart's trial testimony confirms that SBIC understood the contract as specifically setting forth SBIC's scope of work and not requiring it to do anything and everything necessary to get all 83 units ready to rent, at least not independent of significant contributions from

Bernard Construction, which also appears as a "Contractor" in the Contract. Accordingly, the Court finds SBIC was not obligated to deliver the project was not turnkey, and thus SBIC was obligated under the Contract only to do those things specifically listed in its scope of work and the payment schedule.

## IV.     RLA Breached the Contract By Early Termination

7. RLA terminated the Contract on the 168th day after the project's commencement date. Under the Contract, SBIC had 220 days from the commencement date to complete all phases of all buildings.  Article 15.2 of the Contract states that payments may be withheld on account of a number of issues, including "reasonable evidence that the Work cannot be completed for the unpaid balance of the Contract Sum" and "reasonable evidence that the Work will not be completed within the Contract Time and that the unpaid balance would not be adequate to cover actual or liquidated damages for the anticipated delay."  Article 20.2 provides that "if the Contractor defaults or persistently fails or neglects to carry out the work in accordance" with the Contract, RLA was entitled, upon providing SBIC seven days written notice, to either remedy the issue and deduct a proportional amount from the amount due to SBIC or, upon certification by the Owner or the Architect that sufficient cause exists to justify such action, to terminate the contract, take possession of SBIC's tools, and "finish the Work by whatever method the Owner may deem expedient." RLA's termination notice cited Article 20.2 as a basis for its early termination of the contract and RLA listed SBIC's failure to have more of the project completed by the 168th day as sufficient cause for invoking Article 20.2.  However, the Court finds that sufficient cause did not exist for RLA's exercise of its option to terminate the contract under Article 20.2.  The

fact that SBIC had not completed certain Phases of the project on the 168th day of a 220-day project, without more, is not sufficient cause to terminate the Contract. Kevin Stewart testified at trial that even though only a few Phases of the project had been certified complete by this date, most of the difficult work had been performed, and that SBIC was still on schedule to complete all phases in a timely manner. In addition, while the termination notice stated that Building L was "uninhabitable," the evidence at trial demonstrated that SBIC obtained a certificate of occupancy for that building prior to RLA's termination of the contract.[62] Simply put, RLA's early termination of the contract was not justified by the facts of this case.

8. RLA's unjustified early termination of the contract constitutes a breach of the Contract.

## VI. Damages Owed to SBIC as a Result of RLA's Breach

9. Under Louisiana law, the measure of damages as result of a defendant's breach of contract is the amount that will place the plaintiff in the same position it would have been in had the contract not been breached. *See, e.g., Ducote v. City of Alexandria*, 97-947 (La. App. 3 Cir. 2/4/98); 706 So.2d 673, 675 (quoting *Meltzer v. Roof Coatings, Inc.*, 536 F.2d 663 (5th Cir. 1976) and citing *Dixie Roofing Co. of Pineville, Inc. v. Allen Parish School Bd.*, 95–1526, 95–1527 (La. App. 3 Cir. 5/8/96); 690 So.2d 49, 56)). While the measure of damages in a breach of contract case is ordinarily governed by the four corners of the contract itself, *Quality Flooring v. B.F. Const. Co., Inc.*, 09-1471 (La. App. 4 Cir. 1/5/11); 56 So.3d 395, 401, "when there is a legal right to recovery and there is no set way under the contract to determine the exact amount due, the trial court awards damages based upon all facts and circumstances of the case, and such

---

[62] Trial testimony of Kevin Stewart.

16

award is within the trial court's discretion." *Ducote v. City of Alexandria*, 97-947 (La. App. 3 Cir. 3/6/96); 670 So.2d 1378, 1386 (citations omitted). The burden of proving entitlement to damages due to a breach of contract is on the party claiming rights under the contract. *Quality Flooring*, 56 So.3d at 401.

10. Because RLA breached the contract, SBIC has a legal right to recover damages from RLA. The Court, in its discretion and based on the facts and circumstances of the case, determines the appropriate amount of damages to be the value of the work actually performed by SBIC, either under or off the Contract, for which RLA has not remitted payment. In its post-trial memorandum, SBIC demands the remainder of the total contract price, $705,000,[63] but the Court finds an award equaling the difference between that total price and the amount already paid by RLA is not justified in this case.

11. As set forth above, SBIC performed work at the Renata Lakes Apartments complex, under and off the Contract and for which RLA has not remitted payment, in the reasonably invoiced amount of $86,267.44. RLA owes this amount to SBIC in damages.

12. In addition to the specific amounts listed on Invoice 31 for specific tasks, SBIC seeks $70,550 in "Contractors Profit."[64] SBIC did not present any evidentiary support for this claim. Indeed, it appears from Invoice 31 that SBIC built a certain amount of profit into each invoiced amount. Kevin Stewart's testimony confirmed SBIC invoiced RLA

---

[63] Based on a per-unit price of $8,500 and a total of 83 units.

[64] *See* Trial Exhibit 38. This amount was also listed in the prayer for relief in SBIC's state court petition for damages. R. Doc. 1-2 at pp. 2-3.

for tasks, at a price higher than the cost of materials and labor for those tasks, in order to turn a profit. Accordingly, the Court finds SBIC has not met its burden of proving it is owed $70,550 in "Contractors Profit" from RLA.

### VII. RLA's Counterclaim Lacks Merit

13. RLA's counterclaim is based on the argument that the $307,990.39 RLA has already paid to SBIC is more than the amount it actually owed to SBIC. The Court has found that RLA owes additional sums to SBIC for work performed by SBIC under and off the Contract.[65] As a result, RLA's counterclaim fails, and SBIC owes nothing to RLA.

### VIII. RLA Must Return SBIC's Tools or Compensate SBIC

14. To date, RLA has not permitted SBIC to recover its tools from the Renata Lakes Apartments complex project site.[66] Because the Court has found that RLA's termination was a breach of the Contract, RLA wrongfully retained SBIC's tools. Kevin Stewart testified at trial that those unrecovered tools are worth approximately $15,000, an amount RLA does not dispute and the Court finds reasonable. RLA must return SBIC's tools from the project site to SBIC, in the same condition those tools were in when SBIC was terminated, within **thirty (30) days** of the date of this Order. Failure to comply with this deadline will result in RLA being ordered to compensate SBIC for the tools in the amount of $15,000.00 plus legal interest.

---

[65] The Court reiterates the amount credited to RLA as having paid to SBIC includes the $53,000 mobilization fee. Because this fee was paid up front and was to apply to work done by SBIC on the project, it is appropriate to include that amount in the total paid by RLA for work done on the project and not to require SBIC to repay that amount. Even including this amount, RLA has not fully compensated SBIC for work performed.

[66] Trial testimony of Kevin Stewart.

## CONCLUSION

**IT IS ORDERED** that RLA shall pay $86,267.44 to SBIC plus legal interest from the date of demand until paid.

**IT IS FURTHER ORDERED** that RLA shall return SBIC's tools from the Project site to SBIC, in the same condition those tools were in when SBIC was terminated, within thirty (30) days of the date of this Order, or compensate SBIC for the tools in the amount of $15,000.00 plus legal interest.

The Court will enter judgment accordingly.

**New Orleans, Louisiana, this  9th  day of August, 2013.**

                                          **SUSIE MORGAN**
                                   **UNITED STATES DISTRICT JUDGE**